McGREGOR W. SCOTT
United States Attorney
MICHAEL D. ANDERSON
AMY S. HITCHCOCK
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>DEREK BLUFORD,<br><br>　　　　　　　　Defendant. | CASE NO. 2:18-cr-008 MCE<br><br>PLEA AGREEMENT |

## I.　　INTRODUCTION

**A.　Scope of Agreement.**

The superseding information in this case charges the defendant Derek Bluford with violation(s) of wire fraud, in violation of 18 U.S.C. § 1343, engaging in monetary transactions involving criminally derived proceeds, in violation of 18 U.SC. § 1957, with obstruction of a federal investigation, in violation of 18 U.S.C. § 1519, and making false statements to the United States, in violation of 18 U.S.C. § 1001. This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case. This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

PLEA AGREEMENT　　　　　　　　1

B. **Court Not a Party.**

The Court is not a party to this plea agreement. Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of defendant, including activities that may not have been charged in the superseding information. The Court is under no obligation to accept any recommendations made by the government or the defendant.

C. **Rule 11(c)(1)(C) Specific Sentence Agreement.**

The government and the defendant agree that a specific sentence, set forth below in paragraph VI.B.1, would be appropriate in this case. Consequently, this plea agreement is being offered to the Court pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.

Under the provisions of Rule 11(c)(3), the Court may accept or reject the plea agreement, or may defer its decision as to the acceptance or rejection until there has been an opportunity to consider the presentence report. If the Court accepts the plea agreement, the Court will inform the defendant that it will embody in the judgment and sentence the disposition provided for in this plea agreement. If the Court rejects this plea agreement, the Court shall so advise the defendant, allow the defendant the opportunity to withdraw his plea(s), and advise him that if he persists in a guilty plea the disposition of the case may be less favorable to him than is contemplated by this plea agreement.

## II. DEFENDANT'S OBLIGATIONS

A. **Guilty Plea.**

The defendant will plead guilty to Count One, charging him with wire fraud, in violation 18 U.S.C. § 1343, Count Two, charging him with engaging in monetary transactions involving criminally derived proceeds, in violation of 18 U.S.C. § 1957, Count Six, charging him with obstruction of a federal investigation, in violation of 18 U.S.C. § 1519, and Count Seven, charging him with making false statements or representations to the United States, in violation of 18 U.S.C. § 1001. The defendant agrees that he is in fact guilty of these charges and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case. The defendant understands and agrees that he will not be allowed to withdraw his

pleas should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement. The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

### B. **Waiver of Indictment.**

The defendant acknowledges that under the United States Constitution he is entitled to be indicted by a grand jury on the charges to which he is pleading guilty and that pursuant to Fed.R.Crim.P. 7(b) he agrees to waive any and all rights he has to being prosecuted by way of indictment to the charges set forth in the information. The defendant agrees that at a time set by the Court, he will sign a written waiver of prosecution by Indictment and consent to proceed by Information rather than by Indictment.

### C. **Appearance by Videoconference.**

The defendant waives his physical presence at the change of plea hearing and at judgment and sentencing. Pursuant to the CARES Act § 15002(b) and General Order 624, the defendant consents to proceed by videoconference at the change of plea hearing and at judgment and sentencing.

### D. **Remand.**

The defendant agrees to self-surrender into custody no later than three weeks (21 days) after he is sentenced, unless the Court orders him to be remanded into custody sooner. The defendant acknowledges he may be remanded into custody upon the entry of his plea unless he establishes to the Court by clear and convincing evidence that he does not pose a risk of non-appearance or a danger to the community, pursuant to 18 U.S.C. § 3143. The defendant understands that the government may move for remand at any point prior to his self-surrender should facts demonstrate a risk of non-appearance or a danger to the community.

### E. **Restitution.**

The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of certain offenses. The defendant agrees the conduct to which he is pleading guilty requires mandatory

restitution pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii), and agrees to pay restitution to victims affected by his offenses, including, but not limited to the victims covered in the factual basis, victims to be covered in those counts to be dismissed as part of the plea agreement pursuant to 18 U.S.C. § 3663A(a)(3), and other victims as a result of the defendant's conduct for the offenses charged. Defendant specifically agrees to pay full restitution to the individual victims identified in the factual basis as Person 1 and Person 2, which the parties estimate to be between $535,000.00 and $550,353.00. Further, defendant agrees to pay the Federal Bureau of Investigation (FBI) restitution of approximately $41,397.36.

The defendant understands and acknowledges that, pursuant to 18 U.S.C. § 3663(i), the Court may order a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim. Further, the defendant understands that the Court shall ensure that all victims other than the FBI receive full restitution before the FBI receives any restitution.

Defendant further agrees that he will not seek to discharge any restitution obligation or any part of such obligation in any bankruptcy proceeding. Payment of restitution shall be by cashier's or certified check made payable to the Clerk of the Court.

**F.    Fine.**

The defendant reserves the right to argue to Probation and at sentencing that he is unable to pay a fine, and that no fine should be imposed. The defendant understands that it is his burden to affirmatively prove that he is unable to pay a fine, and agrees to provide a financial statement under penalty of perjury to the Probation Officer and the government in advance of the issuance of the draft Presentence Investigation Report, along with supporting documentation. The government retains the right to oppose the waiver of a fine. If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered by the Court, up to the statutory maximum fine for the defendant's offenses.

**G.    Special Assessment.**

The defendant agrees to pay a special assessment of $100.00 on each count of conviction, for a total of $400.00, payable at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing

hearing.  The defendant understands that this plea agreement is voidable at the option of the government if he fails to pay the assessment prior to that hearing.  If the defendant is unable to pay the special assessment at the time of sentencing, he agrees to earn the money to pay the assessment, if necessary by participating in the Inmate Financial Responsibility Program.

### H. Violation of Plea Agreement by Defendant/Withdrawal of Plea(s).

If the defendant violates this plea agreement in any way, withdraws his plea, or tries to withdraw his plea, this plea agreement is voidable at the option of the government.  If the government elects to void the agreement based on the defendant's violation, the government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein.  A defendant violates the plea agreement by committing any crime or providing or procuring any statement or testimony which is knowingly false, misleading, or materially incomplete in any litigation or sentencing process in this case, or engages in any post-plea conduct constituting obstruction of justice.  Varying from stipulated Guidelines application or agreements regarding arguments as to 18 United States Code section 3553, as set forth in this agreement, personally or through counsel, also constitutes a violation of the plea agreement.  The government also shall have the right (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement.  The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge.  The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision.  Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement of any such prosecutions.  The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as

of the date of this plea agreement. The determination of whether the defendant has violated the plea agreement will be under a probable cause standard.

In addition, (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

**I.     Asset Disclosure.**

The defendant agrees to make a full and complete disclosure of his assets and financial condition, and will complete the United States Attorney's Office's "Authorization to Release Information" and "Financial Affidavit" within five (5) weeks from the entry of the defendant's change of plea, including supporting documentation. The defendant also agrees to have the Court enter an order to that effect. The defendant understands that if he fails to complete truthfully and provide the described documentation to the United States Attorney's office within the allotted time, he will be considered in violation of the agreement, and the government shall be entitled to the remedies set forth in section II.H above, above.

**III.     THE GOVERNMENT'S OBLIGATIONS**

**A.     Dismissals/Other Charges.**

The government agrees to move, at the time of sentencing, to dismiss without prejudice the remaining counts in the pending superseding information. The government also agrees not to reinstate any dismissed count except if this agreement is voided as set forth herein, or as provided in paragraphs II.H (Violation of Plea Agreement by Defendant/Withdrawal of Pleas), VI.B (Stipulations Affecting Guideline Calculation), and 0 (Waiver of Appeal and Collateral Attack) herein.

**B.     Recommendations.**

   1.   Incarceration.

The government will recommend that the defendant be sentenced to a term of no more than 84 months imprisonment.

   2.   Acceptance of Responsibility.

The government will recommend a two-level reduction (if the offense level is less than 16) or a three-level reduction (if the offense level reaches 16) in the computation of his offense level if the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. § 3E1.1.  This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

**C.     Use of Information for Sentencing.**

The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court.  The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

### IV.     ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offenses to which the defendant is pleading guilty:

**A.     Count One—Wire Fraud, 18 U.S.C. § 1343**

As to Count One, charging the defendant with wire fraud, in violation of 18 U.S.C. § 1343:

First, the defendant knowingly devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises. Deceitful statements of half-truths may constitute false or fraudulent representations;

Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or

property;

Third, the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and

Fourth, the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

**B.  Count Two—Money Laundering, 18 U.S.C. § 1957**

As to Count Two, charging the defendant with engaging in a monetary transaction involving criminally derived proceeds, in violation of 18 U.S.C. § 1957:

First, the defendant knowingly engaged or attempted to engage in a monetary transaction;

Second, the defendant knew the transaction involved criminally derived property;

Third, the property had a value greater than $10,000;

Fourth, the property was, in fact, derived from wire fraud; and

Fifth, the transaction occurred in the United States.

The term "monetary transaction" means the deposit or transfer, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution.

The term "financial institution" means any insured bank of the Federal Deposit Insurance Act, commercial bank or trust company, private bank, or credit union.

The term "criminally derived property" means any property constituting, or derived from, the proceeds of a criminal offense.

**C.  Count Six—Obstruction of a Federal Investigation, 18 U.S.C. § 1519**

As to Count Six, charging the defendant with obstruction of a federal investigation, in violation of 18 U.S.C. § 1519:

First, the defendant knowingly altered, destroyed, concealed, falsified, or covered up records or documents;

Second, the defendant acted with the intent to impede, obstruct, or influence an investigation that he either knew of or contemplated; and

Third, the investigation was about a matter by or within the jurisdiction of the United States Department of Justice or the Federal Bureau of Investigation (FBI).

### D. Count Seven—False Statements, 18 U.S.C. § 1001

As to Count Seven, charging the defendant with making false statement or representation in a matter proceeding before the United States, in violation of 18 U.S.C. § 1001:

First, the defendant made a false statement or representation;

Second, the statement or representation was made in a matter within the jurisdiction of the FBI, a United States government agency;

Third, the defendant acted willfully; that is, the defendant acted deliberately and with knowledge both that the statement or representation was untrue and that his conduct was unlawful; and

Fourth, the statement or representation was material to the activities or decisions of the FBI; that is, it had the natural tendency to influence, or was capable of influencing, the agency's decisions or activities.

The defendant fully understands the nature and elements of the crimes charged in the superseding information to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V. MAXIMUM SENTENCE

### A. Maximum Penalty.

The maximum sentence that the Court can impose is on Count One is 20 years of imprisonment, on Count Two is 10 years of imprisonment, on Count Six is 20 years of imprisonment, and on Count Seven is 5 years imprisonment, for a total maximum term of 55 years of imprisonment, and a fine of $250,000 on each count, for a total maximum fine of $1,000,000 or twice the gross loss or gross gain; a 3-year period of supervised release; and a special assessment of $100 on each count, for a total of $400.

By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific counts to which he is pleading guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

### B. Violations of Supervised Release.

The defendant understands that if he violates a condition of supervised release at any time during

the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to two additional years imprisonment.

## VI.         SENTENCING DETERMINATION

### A.     Statutory Authority.

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

### B.     Stipulations Affecting Guideline Calculation:

The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate to the following:

    1.     <u>Count Two, Money Laundering, 18 U.S.C. § 1957</u>

        a.     Base Offense Level: **6**

Pursuant to U.S.S.G. § 2S1.1(a)(1), the offense level is from the underlying offense from which the funds were criminally derived. The underlying offense is wire fraud, to which U.S.S.G. § 2B1.1 is applicable. Based on the current interpretation of U.S.S.G. § 2S1.1(a)(1) by the United States Probation Office, because the maximum sentence for a conviction under 18 U.S.C. § 1957 is 10 years, the base offense level is six under U.S.S.G. § 2B1.1(a)(2)).[1]

---

[1] To the extent that the Probation Office changes its interpretation of U.S.S.G. § 2S1.1(a)(1), the United States reserves the right to argue the base offense is 7 under U.S.S.G. § 2S1.1(a)(1) and U.S.S.G. § 2B1.1(a)(1).

PLEA AGREEMENT         10

b. Loss Amount: **+12**

The parties agree that the individual victims of Counts One and Two lost no less than $535,000 through the fraud scheme. Therefore, the offense level is increased by twelve levels pursuant to U.S.S.G. § 2S1.1(a)(1) and 2B1.1(b)(1)(G)-(H).

c. Victim-Related Enhancement: **+2**

Because defendant's offense conduct resulted in a substantial economic hardship to the victims, pursuant to U.S.S.G. §§ 2S1.1(a)(1) and 2B1.1(b)(2)(A).

d. Sophisticated Means: **+2**

Because defendant used sophisticated means to perpetrate his fraud scheme, including the defendant's use of forged or fraudulent emails and/or court or other documents provided to the victims, pursuant to U.S.S.G. § 2S1.1(a)(1) and U.S.S.G. § 2B1.1(b)(10)(C).

e. Conviction under 18 U.S.C. § 1957: **+1**

Because the conviction is under 18 U.S.C. § 1957, the offense level is increased by 1 pursuant to U.S.S.G. § 2S1.1(b)(2)(A).

f. Abuse of Trust Adjustment: **+2**

Because the defendant, as a purported attorney, abused a position of private trust and/or used a specialized skill to facilitate the fraud scheme, pursuant to U.S.S.G. § 3B1.3.

2. <u>Count Seven, Obstruction of a Federal Investigation, 18 U.S.C. § 1519</u>

a. Base Offense Level: **14**

Pursuant to U.S.S.G. § 2J1.2(a).

b. Substantial Interference: **+3**

Because defendant's conduct resulted in substantial interference with the administration of justice, pursuant to U.S.S.G. § 2J1.2(b)(2).

c. Alteration of records: **+2**

Because defendant altered essential or probative records, and otherwise was extensive in the scope, planning, or preparation of his obstruction, pursuant to U.S.S.G. § 2J1.2(b)(3).

3. <u>Grouping</u>: **+1**

The parties estimate that the Counts One and Two will be grouped pursuant to U.S.S.G. §§

PLEA AGREEMENT 11

3D1.1(a) & 3D1.2 (Group 1). The parties agree that the offense level calculation for Group 1 should be determined pursuant to U.S.S.G. § 2S1.1.

The parties further estimate that Counts Six and Seven will be grouped pursuant to U.S.S.G. §§ 3D1.1(a) & 3D1.2 (Group 2). The parties agree that the offense level calculation for Group 2 should be determined pursuant to U.S.S.G. § 2J1.2.

The parties estimate that, pursuant to U.S.S.G. § 3D1.4(b), Group 2 will increase the offense level by 1 level because Group 2 is 6 levels less serious than Group 1.

4. <u>Acceptance of Responsibility</u>:

*See* paragraph III.B.2 above.

5. <u>Criminal History</u>:

The parties do not have any agreements as to the defendant's criminal history. The defendant is permitted to object or otherwise challenge any criminal history calculations determined by the Probation Officer and he preserves the right to argue that his criminal history category substantially over-represents the seriousness of his criminal history, if any, under U.S.S.G. § 4A1.3(b). For its part, the government is permitted to argue in support of any such calculations by the Probation Officer.

6. <u>Departures or Other Enhancements or Reductions</u>:

The parties agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"), or cross-references, or any departure from the Sentencing Guidelines, except that the government may move for a departure or an adjustment based on the defendant's post-plea obstruction of justice (§3C1.1).

**C.    Specific Sentence Agreement.**

The government and the defendant agree that a sentence of a total term of 84 months imprisonment is appropriate in this case. Consequently, as noted in paragraph I.B., this plea agreement is being offered to the Court pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.

### VII.    WAIVERS

**A.    Waiver of Constitutional Rights.**

The defendant understands that by pleading guilty he is waiving the following constitutional

rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to testify on his behalf; (f) to confront and cross-examine witnesses against him; and (g) not to be compelled to incriminate himself.

### B. Waiver of Appeal and Collateral Attack.

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence. The defendant agrees as part of his plea(s), however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not exceed the statutory maximum(s) for the offense(s) to which he is pleading guilty. The defendant understands that this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts attached to this agreement is insufficient to support the defendant's plea of guilty. The defendant specifically gives up the right to appeal any order of restitution the Court may impose.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant understands that these circumstances occur infrequently and that in almost all cases this Agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever attempts to vacate his plea(s), dismiss the underlying charges, or modify or set aside his sentence on any of the counts to which he is pleading guilty, the government shall have the rights set forth in Section II.H herein.

1  **C. Waiver of Attorneys' Fees and Costs.**

The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed pursuant to this plea agreement and any charges previously dismissed).

## VIII. ENTIRE PLEA AGREEMENT

Other than this plea agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

//
//
//

## IX. APPROVALS AND SIGNATURES

### A. Defense Counsel.

I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated: 12/09/2020

HEATHER E. WILLIAMS
Federal Public Defender

/s/ Jerome Price
JEROME PRICE
Assistant Federal Defender
Attorney for Defendant

### B. Defendant:

I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated: 12/09/2020

/s/ Derek Bluford
DEREK BLUFORD
Defendant

### C. Attorney for United States:

I accept and agree to this plea agreement on behalf of the government.

Dated:

McGREGOR W. SCOTT
United States Attorney

/s/ Michael D. Anderson
MICHAEL D. ANDERSON
Assistant United States Attorney

PLEA AGREEMENT                    15

# EXHIBIT "A"

## Factual Basis for Pleas

### Counts One and Two

Person 1 and Person 2 were married and owned a rental property in Discovery Bay, California. They rented their property to Person 3 in 2010. In 2013, Person 3 had stopped paying rent and Person 1 and Person 2 were searching for someone to represent them in eviction proceedings. They came across an advertisement in a landlord magazine for a company called California Legal Pros (CLP), which offered that it represented landlords in eviction proceedings. Person 1 and Person 2 called CLP and spoke with defendant Derek BLUFORD, who said he was the owner of CLP, which was based in Sacramento, California. Bluford claimed to be an attorney and stated that he would represent Person 1 and Person 2 if necessary. BLUFORD is not, in fact, a member of the California State Bar. Believing him to be an attorney, Person 1 and Person 2 decided to retain BLUFORD and CLP to help them evict Person 3. CLP filed an unlawful detainer action against Person 3 in Contra Costa County Superior Court in February 2014.

Thereafter, BLUFORD falsely told Person 1 and Person 2 that Contra Costa County had inspected their house, found mold, and fined them $10,500, and that CLP had paid that fine on behalf of Person 1 and Person 2. Based on these misrepresentations by BLUFORD, Person 1 and Person 2 then reimbursed CLP. In fact, Contra Costa County did not inspect their home and there was no fine levied. Instead BLUFORD obtained Person 1 and Person 2's money for his own personal use. BLUFORD also told Person 1 and Person 2 that Person 3 was threatening to countersue (which was true) and that he negotiated a settlement to pay Person 3 for $130,000, as well as to set aside $25,000 for repairs to their property (which was not). In fact, Person 3 agreed with BLUFORD to accept approximately $4,500. BLUFORD created a false settlement document, including forging Person 3's signature, and BLUFORD converted the rest of the money for his personal use. He then told Person 1 and Person 2 that he solicited bids to repair the property, but that the cheapest one was $56,000, for which Person 1 and Person 2 would need to contribute additional funds. They agreed. Rather than do any repair work, BLUFORD used the money for himself.

BLUFORD then told Person 1 and Person 2 that Contra Costa County and Discovery Bay had separately fined Person 1 and Person 2 collectively $300,000 ($270,000 by Contra Costa and $30,000 by Discovery Bay) because, according to BLUFORD, Person 3 had sent an email to Person 1 and Person 2 complaining about the mold but that Person 1 and Person 2 did not respond. BLUFORD showed them a copy of the email, which Person 1 and Person 2 did not recognize and, in truth, was never sent. BLUFORD told Person 1 and Person 2 that he contacted Contra Costa County and Discovery Bay, which agreed to credit them the cost of the (bogus) repairs that BLUFORD had arranged, and so that the total fine was $244,000. BLUFORD told Person 1 and Person 2 that CLP would pay the fine on their behalf and that they should then pay him. They agreed and paid BLUFORD $244,000.

At various points Person 1 and Person 2 requested copies of documents, such as the inspection report from the Contra Costa County. BLUFORD told them that the "Inspection Attorney" refused on privacy grounds (no such position exists) or came up with other reasons why such records could not be provided. Other times he provided forged or fraudulent documents.

Person 1 and Person 2 also continued to question about the supposed email from Person 3 that formed the basis of the second round of (fake) fines, as they did not believe it was ever sent. BLUFORD offered to represent them in a trial to prove that the email was never sent and then to try to get a refund of the monies they believed they paid to Contra Costa County and Discovery Bay (but which, in truth, had been used by BLUFORD). BLUFORD offered to represent Person 1 and Person 2 in the trial for an additional $5,000. After a few months, BLUFORD told Person 1 and Person 2 that they lost the trial and that the court ordered them to pay costs of $57,600. BLUFORD provided a supposed order signed by a "Judge E. Newcomb." In truth, there was no lawsuit filed by BLUFORD with respect to the email, no court order requiring payment of $57,000, and no Judge Newcomb in

1  Contra Costa County Superior Court. Person 1 and Person 2 complained about the escalating costs, and BLUFORD agreed that he would accept only $30,000 from Person 1 and Person 2, with CLP itself
2  paying the remainder of the non-existent court order.

3  Having already lost hundreds of thousands of dollars in what Person 1 and Person 2 believed were fines and court costs (in actuality, BLUFORD's fraud scheme), they wanted to sell their property.
4  They inquired of BLUFORD about the possibility of contacting their insurance company to see if it might cover some of the repair or other costs. BLUFORD said he would file the necessary documents in
5  court, but instructed Person 1 and Person 2 not to contact their insurance company directly. BLUFORD then falsely told Person 1 and Person 2 that he had filed the necessary documents for $7,200, and that he
6  had paid $40,000 to reserve the trial date to force the insurance company to give them coverage. BLUFORD also provided a new round of fraudulent court documents to Person 1 and Person 2. Person
7  1 and Person 2 paid the $7,200 but complained about the $40,000 cost for another trial. BLUFORD offered to take $30,000, which Person 1 and Person 2 paid. Thereafter the fraud scheme was
8  discovered.

9  With respect to Count One, on or about October 27, 2014, at the direction and request of BLUFORD, Person 1 and Person sent a $30,000 wire transfer from their bank account to a bank account
10 controlled by BLUFORD in the name of CLP in Sacramento, California. The wire transfer was processed through the FedWire system, which involved interstate wire transmission through the New
11 Jersey. The money wired was a result of and in furtherance of BLUFORD's fraud scheme described above.
12
    The total amount of money that was sent by Person 1 and Person 2 to BLUFORD or to the
13 accounts that he controlled was no less than $535,000.

14 With respect to Count Two, on or about March 17, 2014, BLUFORD caused $110,000 to be transferred from the CLP bank account he controlled to another bank account he controlled that was in
15 the name of an immediate family member. As BLUFORD knew, the money was derived from the fraud scheme described above. The transaction involved a financial institution insured by the Federal Deposit
16 Insurance Corporation, including during the time period of March 2014.

17 The defendant Derek BLUFORD admits that from February 2014 through at least November 2014, in Sacramento, California, and elsewhere, he executed an scheme to defraud Person 1 and Person
18 2 of money and property, including through the use of interstate wire transmissions, and that he caused the proceeds of that scheme in excess of $10,000 to be transferred between bank accounts that he
19 controlled at financial institutions.

20 ***Counts Six and Seven***

21 On January 11, 2018, a federal grand jury returned a five-count indictment charging the defendant with wire fraud, in violation 18 U.S.C. § 1343, and money laundering, in violation of 18
22 U.S.C. § 1957, in connection the facts described above.

23 On approximately October 5, 2018, BLUFORD, through counsel, contacted the government and stated that he was in possession of information he believed would be of interest to the government, and
24 proposed providing that information in exchange for the possibility of a reduced sentence in his pending case. Accordingly, on or about October 30, 2018, BLUFORD met with representatives of the Federal
25 Bureau of Investigation (FBI) and the United States Attorney's Office (USAO). In this meeting, BLUFORD offered information about, and made allegations against, Person 4, Person 5, Person 6, and
26 Person 7. BLUFORD alleged that Person 4 was engaged in a bribery scheme in which he conspired with certain public officials, including Persons 5, 6, and 7, to steer municipal contracts from various
27 localities to a company in which he had a financial interest, Company A. In return, Persons 5, 6, and 7, would receive kickbacks, campaign contributions, or cash. During the meeting with the FBI,
28 BLUFORD showed text messages he claimed were between him and Person 4 regarding the scheme, and played audio recordings he claimed to have surreptitiously recorded of conversations between him

PLEA AGREEMENT                    A-2

and Person 4. BLUFORD agreed to provide the FBI with copies of the text messages and audio recordings he claimed corroborated his information, and was advised not to make further surreptitious recordings.

In November 2018, the FBI opened an investigation to determine whether the allegations made by BLUFORD could be substantiated (hereinafter, the "Investigation"). The FBI was able to corroborate some of the initial information provided, including, but not limited to, BLUFORD's relationship with Person 4, Person 4's financial interest in Company A, and associations between Person 4 and Persons 5, 6, and 7. In furtherance of the Investigation, the FBI interviewed BLUFORD again on or about March 7, 2019. At the beginning of this interview, BLUFORD confirmed that he was providing information voluntarily, and that he understood that lying to the FBI was prohibited and could constitute a violation of 18 U.S.C. § 1001. BLUFORD then provided further information regarding Persons 4, 5, 6, and 7 and the alleged bribery scheme, and stated that he was willing to cooperate with the Investigation and help in any way possible. On or about May 29, 2019, BLUFORD was again explicitly advised that information provided to the FBI was entirely voluntary, and that all information provided must be truthful. BLUFORD confirmed he understood.

Thereafter, BLUFORD continued to voluntarily provide information to the FBI in relation to the Investigation. This included providing to the FBI text messages and emails he claimed to have received from Persons 4 or 5, or which concerned Persons 4, 5, 6, 7, or otherwise related to the alleged bribery scheme. Throughout the course of the Investigation, the FBI worked to obtain evidence through independent means, including surveillance, recorded calls and meetings, and gathering and analysis of electronic records, to determine whether BLUFORD's initial allegations could be substantiated, and/or otherwise authenticate or corroborate the information provided to the FBI by BLUFORD.

On or about December 2, 2019, BLUFORD reported to the FBI that he had received two emails from Person 4 which contained information relevant to the Investigation, including specific references to Person 6, and to Person 8, another public official who was not at that time a primary subject of the Investigation. BLUFORD initially provided the FBI with screenshots of these emails, which appeared to come from Person 4 because BLUFORD had purposefully, and secretly, saved the sender email account within his contacts as "Person 4," along with true email accounts used by Person 4, as previously corroborated by the Investigation. The content of the email also appeared to be consistent in tone and content with other emails from Person 4 reviewed and verified by the FBI in the course of the Investigation, and included details consistent other events corroborated by the FBI. Thus, the FBI took steps in the Investigation to follow-up on this information.

On or about December 11, 2019, BLUFORD reported to the FBI that he had received another email from Person 4, which again contained information relevant to the Investigation. The email, again provided to the FBI initially in a screenshot, appeared to respond to an email from BLUFORD to Person 4, and encouraged BLUFORD to finalize a municipal contract and set meetings with Person 5 and Person 8. On January 17, 2020, BLUFORD again reported to the FBI that he had received an email from Person 4, again containing information relevant to the Investigation. On or about January 18, 2020 and again on January 22, 2020, an FBI agent directly asked BLUFORD whether the emails were written by and sent from Person 4; BLUFORD insisted they were.

In fact, as the FBI was able to later confirm, BLUFORD had created the Gmail Account in Person 4's name, created emails falsely purporting to be from Person 4, and provided them to the FBI in an effort to direct and influence the Investigation. The emails provided to the FBI by BLUFORD were from a Gmail account bearing the nickname and other identifiers of Person 4 (hereinafter, the "Gmail Account"), but different than the email accounts previously used by Person 4 in emails reviewed by the FBI and corroborated in the course of the Investigation. Google records obtained by the FBI showed the Gmail Account was created under the name of Person 4, but only on December 2, 2019, and only to send the specific emails BLUFORD provided to the FBI. Google records also showed the Internet Protocol (IP) addresses used to create the Gmail Account and send these emails, and internet service provider records revealed that these IP addresses were associated with BLUFORD himself. Indeed, the FBI determined that BLUFORD had created the account and written the emails himself, falsely

PLEA AGREEMENT   A-3

purporting to be Person 4, and provided them to the FBI with the intention of directing and influencing the Investigation.

In approximately the same time period, beginning on or about December 2, 2019, BLUFORD also made further false statements and provided false invoices to the FBI in an effort to obtain money. Specifically, BLUFORD submitted requests for reimbursement or advances for expenses he claimed were related to Company A's efforts to obtain a municipal contract, expenses he supported with falsified invoices, but were in fact intended for personal or unauthorized use. As the Investigation continued to work to independently corroborate information provided by BLUFORD, the FBI obtained the original vendor invoices, and determined that BLUFORD falsely inflated the invoices he submitted, including invoice #T276227514 dated December 23, 2019, and made false statements regarding these expenses to the FBI. In total, BLUFORD inflated the invoices submitted by approximately $41,397.36.

Upon identification of BLUFORD's false statements and obstructive conduct, the FBI executed a search warrant upon BLUFORD's personal devices. This search showed emails and text messages that further corroborated the determination that BLUFORD had made false statements and submitted false records to the FBI in an effort to influence the Investigation.

I have reviewed the entire factual basis in Exhibit A above and, as far as my own conduct is concerned, I adopt it as my own true statement.

DATED: 12-9-2020

_____
DEREK BLUFORD
Defendant